**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

R.O, a Minor, by his parent and guardian JONATHAN
OCHSHORN; T.S., a Minor, by his parent and guardian
MARK E. SORRELLS; ANDREW M.H. ALEXANDER;
HARRY T. STINSON; L.F., a Minor, by her parent and
guardian ELIZABETH A. FATTARUSO; A.H., a Minor,
by his parent and guardian TERESA HALPERT
DESCHANES; BRYAN ELLERBROCK; and P.P., a
Minor, by his parent and guardian RAMESH RAJ
POKHAREL,

|                           |                    |
|---------------------------|--------------------|
|          Plaintiffs,      | 5:05-CV-695        |
|                           | (NAM/GJD)          |
|     v.                    |                    |

ITHACA CITY SCHOOL DISTRICT; JUDITH C. PASTEL,
Superintendent, in her official and individual capacities;
WILLIAM RUSSELL, Assistant Superintendent, in his
official and individual capacities; and JOSEPH WILSON,
Ithaca High School Principal, in his official and individual
capacities,

                             Defendants.
_____

| **APPEARANCES:**                      | **OF COUNSEL:**              |
|---------------------------------------|------------------------------|
| Schlather, Geldenhuys, Stumbar & Salk | Raymond M. Schlather, Esq.   |
| 200 East Buffalo Street               |                              |
| P.O. Box 353                          |                              |
| Ithaca, New York 14851                |                              |
| *Attorney for Plaintiffs*             |                              |
|                                       |                              |
| Lemire Johnson, LLC                   | Gregg T. Johnson, Esq.       |
| 2534 Route 9                          |                              |
| P.O. Box 2485                         |                              |
| Malta, New York 12020                 |                              |
| *Attorney for Defendants*             |                              |

**Norman A. Mordue, Chief U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

Plaintiffs, former students of Ithaca High School ("IHS"), commenced this action against the Ithaca City School District ("ICSD"), the School's Superintendent Judith C. Pastel, the Assistant Superintendent William Russell and the Principal of IHS Joseph Wilson (collectively "defendants") pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201. Plaintiffs seek compensatory damages, declaratory judgment and injunctive relief. This action stems from defendants' decisions with regard to the IHS newspaper, *The Tattler* and an independent student newspaper, *The March Issue*. Plaintiffs claim that defendants' decision to interfere with the publication of certain material in *The Tattler* and defendants' decision to apply guidelines to *The Tattler* violated plaintiffs' First Amendment rights. Plaintiffs also challenge defendants' decision to prohibit the distribution of *The March Issue* on ICSD grounds.

Presently before the Court is defendants' motion for summary judgment pursuant to Fed. R. Civ. Pr. 56. (Dkt. No. 32).

## FACTUAL BACKGROUND

The facts in this case, unless otherwise noted, are undisputed.[1] Plaintiffs are former members of the staff/editorial board of *The Tattler*. Plaintiff R.O. was involved in the production of *The Tattler* from 2001 until 2005 and served as Editor-in-Chief for the 2004-2005 academic year. Plaintiff Bryan Ellerbrock was a member of the staff during the 2003-2004 academic year and served as Distribution Manager during the 2004-2005 academic year. Plaintiff T.S. was the Copy Editor for the 2004-2005 academic year. Plaintiff Andrew M.H. Alexander served as Activities Editor for the 2003-2004 academic year and News Editor during the 2004-2005

---

[1] The facts set forth in this section are taken from: (1) the Complaint; (2) the Answer; (3) Defendants' Statement of Undisputed Material Facts; (4) Plaintiffs' Response to Defendants' Statement of Material Facts; (5) the exhibits and evidence submitted by Defendants in support of their Motion for Summary Judgment; and (6) the exhibits and evidence submitted by Plaintiffs in Opposition to Defendants' Motion for Summary Judgment.

academic year.  Plaintiff Harry T. Stinson served as Sports Editor from 2003-2005.  Plaintiff L.F. served as Advertising Manager for the 2003-2004 academic year and Photography Editor during the 2004-2005 academic year.  Plaintiff A.H. was in charge of the Arts and Entertainment section from 2003-2005.   Plaintiff P.P. served as the News Editor during the 2003-2004 academic year and Layout Editor for the 2004-2005 academic year.   Plaintiffs graduated from Ithaca High School in June 2005.

Defendant Judith Pastel has been Superintendent of the ICSD since 1996.  Defendant Joseph Wilson has been Principal of IHS since 2004.  Defendant William Russell was Assistant Superintendent of the ICSD from 2000-2006 and is currently the Superintendent of the Oswego Central School District.

**A.    The Newspaper**[2]

The banner on the front page of *The Tattler* identified the newspaper as  "*The IHS Tattler*".  Below the name of the newspaper, the following information was provided:

• Published Monthly • www.ihstattler.com • Ithaca High School, 1401 N.Cayuga St., Ithaca, NY 14850

The masthead of the May 2001 issue of *The Tattler* contained the following language:

> *The Tattler* is the student-run newspaper of Ithaca High School.  *The Tattler* was founded in 1892, and is published six times per year.  *The Tattler*, as an open forum, invites submissions of opinion pieces and letters to the editor from all members of the IHS community.

The masthead of the January 2005 issue contained the following language:

> *The Tattler* is the student-run newspaper of Ithaca High School.  *The Tattler* was founded in 1892, and is published monthly.  *The Tattler*, as an open forum, invites submissions of opinion pieces and letters to the editor from all members of the community.

---

[2] The content of the newspaper, as discussed herein, is for the relevant time period as referenced in the complaint.

3

The masthead of the February 2005 and June 2005 issues of *The Tattler* contained the following language:

> *The Tattler* is the student-run newspaper of Ithaca High School. *The Tattler* was founded in 1892, and is published monthly. *The Tattler* invites submissions of opinion pieces and letters to the editor from all members of the community.

The ICSD provided *The Tattler* staff with an office inside IHS and paid for all expenses related to the maintenance and operation of the office including heat, light, power, insurance and cleaning. *The Tattler* staff shared the office with the yearbook staff. The ICSD also provided some computer equipment, a free phone line, internet access, an access code to an ICSD photocopier, some furniture and some office supplies. The ICSD provided *The Tattler* with an annual budget for postage, printing and publication.[3] *The Tattler* was published once a month with an issue distributed to each teacher in the high school. In addition, copies of the newspaper were placed in every home room, the cafeteria, the library and the courtyard of IHS. Copies were sent for distribution to the Board of Education for the middle school (10 copies), and elementary schools (5 copies).[4] During the 2004-2005 academic year, there was a newspaper stand outside *The Tattler* office. In addition, copies of *The Tattler* were distributed to the local community, in grocery stores, coffee shops, bakeries and other local businesses. There were 3000 copies of each issue printed, of which, approximately 1000 copies were distributed off ICSD grounds.

**B.       The Faculty Advisor**

---

[3] The parties dispute the amount of funding. Defendants claim that the budget "cover[ed] postage, printing and publication". Plaintiffs allege that the budget covered 25 % of the cost of producing the newspaper with 75% of the funding provided "from other sources" including advertising sales made by students to local merchants.

[4] Plaintiffs claim that the newspaper was distributed for the use of the teachers in the middle and elementary schools.

Since 1979, *The Tattler* has operated with a Faculty Advisor.[5]   The Faculty Advisor received a teaching release credit for one class and an annual stipend from the ICSD.  From 1992 until 2003, the Faculty Advisor was Eileen Bach.[6]  In an affidavit, Ms. Bach provided her perspective of the role of the Faculty Advisor:

> The role of the Faculty Advisor is to advise and to persuade, not dictate.  Ultimately, the final decisions with respect to article ideas and selection, editorial viewpoints and comments, reviews, other stories and newspaper content are made by the editorial staff and ultimately the editor-in-chief.  The only exception to this broadly stated authority is in cases involving articles that are libelous within the meaning of the law, articles that are obscene within the meaning of the law or articles that advocate immediate, violent disruption of school activities in violation of the law (i.e. akin to shouting "fire" in a crowded theater).  In such exceptional cases, the Faculty Advisor did have the final say, subject to review by the principal.

Bach Aff. ¶ 8.  Stephenie Vinch served as Faculty Advisor from 2003 until she resigned in 2005.  Ms. Vinch testified that it was her understanding that the Faculty Advisor "had final say over the content of *The Tattler* articles".  Ms. Vinch provided an affidavit and discussed her perspective of the role of the Faculty Advisor:

> During my time as Faculty Advisor for *The Tattler*, the typical process for creating an issue of *The Tattler* was as follows: the Faculty Advisor and staff would work to create story ideas for each issue; a meeting would be held at which story ideas were presented, discussed, and assigned to individual writers; the writers would go out and conduct research, then write stories and submit them to the student editors for review; the articles would then be reviewed by the section editors, who would edit the articles; the Editor-in-Chief would then review all the articles submitted by the section editors for print; once an issue of *The Tattler* was put together by the Layout Editor, I, as Faculty Advisor, would receive a "proof set" which I would review, mark up, edit and revise; once the changes I noted were made, the final draft version of each issue was reviewed by the editors and me, approved or modified, and then sent to a commercial printer.  I was involved in all stages of the aforementioned process.

---

[5] The role, duties and function of the Faculty Advisor is disputed.

[6] Ms. Bach is Bryan Ellerbrock's mother.

Vinch Aff. ¶6.  As Faculty Advisor, Ms. Vinch attended two student journalism conferences.  Ms. Vinch participated in the faculty advisor workshops while the students attended workshops for student writers.  The ICSD provided some reimbursement for the costs associated with attending the workshops.[7]

Plaintiff R.O. provided an affidavit with his opinion of the role of the Faculty Advisor. R.O. claimed that the decisions concerning the publication and content of *The Tattler* were made by the Student Editorial Board in consultation with the Faculty Advisor.  R.O. stated that the students exercised final control over the editorial and content decisions including the selection and editing of articles, cartoons and other submissions.

**C.      The Newspaper Staff**

The editors of *The Tattler* were selected by the senior staff from the prior year.  The Faculty Advisor and the ICSD did not control the selection of the editorial staff of *The Tattler*. During school hours, *The Tattler* staff was permitted to work on the newspaper during free periods, lunch and at times when there was no conflict with class attendance.  On occasion, editors were given credit for their work on *The Tattler*.  Specifically, plaintiff R.O. received partial school credit for his work as Photography Editor for *The Tattler*.

**D.      ICSD School Conduct Manual**

The ICSD School Conduct Manual (A Guide to Student Rights, Responsibilities, and Discipline) for the 2004-2005 academic year provided, in pertinent parts, as follows:

B.       First Amendment Rights

---

[7] The parties dispute the amount of the reimbursement.

The First Amendment in the Bill of Rights of the United States Constitution provides in part that Congress will make no law prohibiting the free exercise of religion, freedom of speech, the right of people to assemble peaceably and the right to petition the government for a redress of grievances.

The School District has the right to establish reasonable regulations for the exercise of these rights by its students. Some of the specific rights that students have under this amendment and the conditions under which they may exercise these rights are as follows:

1.    Student Speech: Although the First Amendment to the U.S. Constitution guarantees freedom of speech to all Americans, this does not permit students to interfere with the orderly conduct of classes, to force others to participate in a particular method of expression, or to violate the rights of those who disagree with their point of view.

       Therefore, student speech may be subject to disciplinary action or restriction if it:

       ● is slanderous, i.e., spoken maliciously and without regard to the truth;
       ● clearly and immediately urges others to damage property or physically harm others; or materially or substantially interferes with the normal operation of the school.

2.    Literature Distribution, Surveys and Petitions: Students may distribute literature including questionnaires, surveys, and petitions on school grounds only with the authorization of the Superintendent. Persons not connected with the schools may not distribute literature without specific prior authorization of the Superintendent. School authorities may regulate the distribution of literature on school grounds for the purpose of avoiding material and substantial interference with the educational operation of the school.

6.    School Newspapers and Student Publications: Newspaper staff members, contributors, or editors and students have a responsibility to observe the rules for responsible journalism, and, in particular to refrain from libel and obscenity. The school has the right to halt distribution of materials that would materially and substantially interrupt the educational process or intrude upon the rights of others.

       School newspapers in the Ithaca City Schools must also permit students who are not members of their staff to have the ability to have their work to be submitted and considered for publication in the school newspapers,

7

particularly in those instances where non-editorial staff opinions differ from those of the editor.

Students in the District have the right to publish and distribute unofficial or non-school-sponsored newspapers on their own and with their own resources. Such publication and distribution does not indicate that the paper is representative of the school. The newspaper staff members have sole responsibility for any statement(s) published, and such publications have moral and legal obligations to observe the normal rules of responsible journalism. Distribution of such papers on school property is subject to the procedures established for literature distribution.

**E.    Relevant issues of *The Tattler* and Defendants' Response**

On May 5, 2004, an issue of *The Tattler* was published with a personal ad entitled "Personales . . .". The ad contained the following information:

6'8" Hispanic male seeking intimate relationship with class of 2005 Presidente. Must want to watch Teletubbies on sofa with me.

Ms. Vinch provided an affidavit and stated that the ad, "insinuated that the President of the Class of 2005 was a homosexual". Ms. Vinch did not review or approve the ad prior to its publication. Ms. Vinch assumed that the students had intentionally inserted the article in the final printed version. Ms. Vinch decided to cancel the next issue of *The Tattler*, scheduled for production in June 2004.[8]

In October 2004, the staff of *The Tattler* disseminated a survey to the students at IHS asking for an evaluation of their confidence in Principal Wilson. The results of that survey revealed that there was a lack of confidence among the students in Principal Wilson's ability to perform his job. The results were published in the November 2004 issue of *The Tattler*. Subsequently, *The Tattler* staff sought permission to conduct a survey of the IHS's faculty

---

[8] Defendants claim that the student editors and staff of *The Tattler* did not appeal the decision to cancel the June 2004 issue.

concerning their confidence in Principal Wilson.  Pursuant to ICSD policy, the staff requested

permission from Superintendent Pastel to distribute the faculty survey.  Superintendent Pastel

stated that she was concerned about "personally identifying information which could conflict with

the ICSD's collective bargaining agreement with the Ithaca's Teachers Association" and

requested that the student's submit a revised survey without such information.[9]  *The Tattler* staff

was granted permission to administer the revised survey.  The results of the revised survey were

published in the December 2004 issue of *The Tattler*.

In late December 2004 or early January 2005, Ms. Vinch received a proof set of the

January issue of *The Tattler* for review.[10]  The proof set included a cartoon created to accompany

an article written by a former IHS student entitled "Alumni Advice: Sex is fun!".[11]  The cartoon

contained a doorway with the phrase "Health 101" over the door.  The drawing also depicted a

teacher pointing to a blackboard which contained eight stick figure drawings in sexual positions

with the phrase "Test on Monday" under the drawings.[12]   After reviewing the cartoon, Ms. Vinch

consulted with Ms. Bach.[13]  Ms. Vinch deemed the drawing to be obscene and inappropriate for

high school students.  Ms. Vinch "crossed out" the article and stick figures drawing on the proof

---

[9] *The Tattler* staff did not appeal the decision.

[10] The parties dispute the purpose of the "proof set" but concur that Ms. Vinch received a proof set to review prior to the publication of each issue of *The Tattler*.

[11] The cartoon was the second drawing created by Ben McKee, a former IHS student, at the request of plaintiff L.F. (Photography Editor).  The first cartoon submitted by Mr. McKee was deemed "inappropriate" by L.F. L.F. sent an e-mail to R.O. stating, "I really don't think the sex cartoon will/should fly".

[12] Plaintiff R.O. was given a copy of the cartoon and asked to describe the content during his examination before trial.

[13] Ms. Vinch testified that she also consulted with Ken Pickens (Chair of the English Department), Kim Swartz (an English teacher) and Jean Amodeo (an English teacher).  Ms. Vinch claimed that her colleagues told her, 'it shouldn't be run".

set.  The January 2005 issue of *The Tattler* was printed without the cartoon and article.[14]  The editors did not appeal this decision.

After the January 2005 issue of *The Tattler* was circulated, the faculty, student body and Ithaca community expressed concerns regarding other articles.  The "center spread" article was entitled "Academic Dishonesty at IHS" and identified a class where cheating could be accomplished and the name of the IHS teacher who taught the class.[15]  Defendants took disciplinary action against certain students as a result of the article.  Another article entitled "Ralph's Ribs, meh" included references to "smackin' a ho", "colla greens" and "pimpin cane".  On January 7, 2005, the ICSD received a letter from Ardell Alling, the Shift Supervisor for Ralph's Ribs.  In the letter, the staff of Ralph's Ribs claimed that the article contained racial slurs and "hurtful overtures".

In late 2004 or early 2005, Ms. Vinch met with Principal Wilson and Dr. Russell and expressed her intention to resign as Faculty Advisor.  Ms Vinch stated that her desire to resign was "as a result of increasing resistence by the staff of *The Tattler* to my role as Faculty Advisor".  Ms. Vinch discussed the possibility of implementing guidelines and her need to know what was expected of her from the administration.[16]  Ms. Vinch subsequently provided Dr. Russell with a draft of proposed guidelines which she thought "would be helpful in continuing to manage the

---

[14] Plaintiff R.O. alleges that, "the decision to not publish the [] cartoon was made by me after consultation with some of the other student editors".

[15] R.O. provided an affidavit and stated that during a November meeting for the December 2004 edition of The Tattler, the staff discussed articles about cheating and the possibility of a writer submitting a plagiarized assignment.  The remaining evidence regarding the article is not in admissible form or disputed.

[16] Dr. Russell testified that prior to 2005, there were no written guidelines in the ICSD for *The Tattler*.

paper".[17]  Dr. Russell discussed the issue of the possibility of implementing guidelines with

Superintendent Pastel and ICSD's counsel, Bond Scheoneck & King, PLLC.  In formulating the

Guidelines, Dr. Russell claims that he also considered articles from the Student Press Law Center

provide by R.O. and various Supreme Court opinions relevant to the issues.[18]

On January 21, 2005, Dr. Russell and Principal Wilson met with Ms. Vinch and the

editors of *The Tattler* and provided copies of a one-page document entitled Guidelines for *The

Tattler* Advisor and Editors ("the Guidelines") (dated January 19, 2005).  The relevant Guidelines

provided as follows:

- *The Tattler* is an Ithaca High School-sponsored publication of the Ithaca City School District ("the District").  *The Tattler* is published to inform the school community about matters of news and interest, to serve as a forum for student views and opinion, and to impart journalist skills to Ithaca High School Students.

- The faculty advisor to *The Tattler* will be given a list of story ideas before story assignments are distributed to writers.  The advisor must approve all stories before they are assigned.

- The advisor to *The Tattler* shall read, edit and approve all articles prior to publication.  No issue of *The Tattler* may be sent to the printer without final approval of the advisor.

- In a manner that is consistent with the standards established by the Supreme Court in *Tinker* and *Hazelwood*, the advisor has the right to change, edit or remove content that:

    o    would substantially interfere with the District's work or impinge upon the rights of other students; or

---

[17] The record does not indicate whether Ms. Vinch provided a draft to Dr. Russell during that meeting or sometime thereafter.

[18] Dr. Russell testified that "several revisions went back and forth resulting in . . . [the January 19, 2005] draft".

11

○    is inconsistent with the legitimate pedagogical concerns of the District (for example, content that is ungrammatical, poorly written, inadequately researched, inaccurate, libelous, biased or prejudiced, unethical, vulgar or profane, or is not suitable for immature audiences).

In late January 2005, *The Tattler* editors sought to publish the same cartoon with stick figure drawings in the February 2005 edition.  The staff intended to print the cartoon to accompany a serious article entitled "How is Sex Being Taught In Our Health Class?"  Ms. Vinch refused to allow the cartoon to be published in the February 2005 issue.  However, the article was printed in the February 2, 2005 issue of *The Tattler* without the cartoon.[19]

On January 31, 2005, R.O. sent a letter to Principal Wilson formally appealing Ms. Vinch's decision to "censor the cartoon accompanying the 'sex-ed' article in the February 2, 2005 *Tattler* due to obscenity".  R.O. expressed his view that the cartoon was not obscene according to the definition from the Student Press Law Center.  Moreover, R.O. stated that the depiction of "sexual acts is entirely abstract, using stick figures lacking any graphic delineation of sexual organs".  R.O. stated that the Guidelines under which the cartoon was censored, violated First Amendment rights.  R.O. further requested that Principal Wilson rescind the new Guidelines governing *The Tattler*.

On February 3, 2005, Ms. Vinch resigned as Faculty Advisor of *The Tattler*.  No issues of *The Tattler* were published in March, April or May 2005.

On February 9, 2005, Principal Wilson denied plaintiffs' appeal of Ms. Vinch's decision to refuse to allow the cartoon to be publish.  Principal Wilson stated that:

---

[19] Although not admitted by plaintiffs, the record contains a copy of the February 2, 2005 issue of *The Tattler*.  A blank box appears on the same page as the article and contains the caption: "Image censored.  A cartoon providing commentary on sex education was deleted by *The Tattler* advisor.  Editors are currently appealing the decision".

> We believe that the nature of the cartoon, which depicts stick figures in various sexual positions, was obscene and not suitable for immature audiences, and consequently, was inconsistent with the educational mission and concerns of the District. You indicated that the "childlike drawings are devoid of erotic content." It is our opinion, however, that the cartoons provided sufficient graphic detail, which may potentially force emotionally immature students to be confronted with difficult adult issues prematurely.

Principal Wilson also denied R.O.'s request to rescind the Guidelines for *The Tattler*.

On February 15, 2005, R.O. sent a letter to Superintendent Pastel appealing Principal Wilson's decision pursuant to the ICSD Student Grievance Procedures. On March 9, 2005, Superintendent Pastel formally denied the appeal of Principal Wilson's decision regarding the cartoon. Superintendent Pastel disagreed with plaintiffs' claim that the cartoon was not obscene and stated:

> The stick figures are explicitly shown in various positions of sexual intercourse. As such, they appeal to the prurient interest in sex, i.e., "having or expressing lustful ideas or desires"; (see Webster's New World Dictionary). Further, they are patently offensive in that they depict the ultimate sexual act.

Superintendent Pastel continued:

> . . . under *Hazelwood* or *Tinker*, the right of the District to control what is published in the school newspaper is not limited to material that is obscene. The cartoon will substantially interfere with the work of the school and impinge upon the rights of other students. Distribution of this offensive cartoon to all students would clearly offend many of the students. Please recall that the high school includes ninth graders. The mockery made of sexual intercourse in the stick figures would raise inappropriate questions in the minds of many immature students and interfere with what is being taught in the health curriculum regarding both responsibility and abstinence.

With regard to Superintendent Pastel's decision, the record contains correspondence dated February 2005 from the ICSD to the "Parents/Caregivers of Secondary Students". The purpose of the letter was alert parents and/or caregivers of several recent potentially dangerous trends among the students. The concern arose from information received from students, teachers, parents and

13

support personnel.  The letter, which was signed by Superintendent Pastel, Principal Wilson and the Principals of the middle schools, advised parents and/or caregivers of drug use, alcohol use and risky sexual behavior at an early age.  Of relevance to the issues herein, the letter addressed aggressive recruiting and pressuring for sexual favors and aggressive exploitation of younger students by older students for sexual favors.

**F.**     ***The March Issue***

While plaintiffs' appeal of the decision regarding the publication of the cartoon was pending, the editors of *The Tattler* created an independent newspaper entitled *The March Issue*. *The March Issue* contained articles written by *The Tattler's* editors and staff.  The banner on the front page of *The March Issue* contained the following language:

*The March Issue*
Ithaca High School's Independent Student Newspaper
March 9, 2005 • Not Affiliated with or Funded by Ithaca High School

The front page of *The March Issue* contained a portion of the subject cartoon.  However, a large black circle covered the stick figures on the blackboard and the word "CENSORED" was written in bold, capital letters below the circle.   The second page of *The March Issue,* The Opinion Page, contained the entire cartoon under the title "Editorial: Censored - Graphic editorial and timeline following the Ithaca City School District's censorship of *The Tattler*".

On March 3, 2005, R.O. requested permission from Dr. Russell to distribute *The March Issue* to home rooms in the IHS "in the same manner that school sponsored publications distribute".  R.O. intended to provide Dr. Russell and Superintendent Pastel with a final set of proofs as the ICSD "requires approval of all literature before distribution".

On March 8, 2005, Superintendent Pastel sent a letter to R.O. in response to the request to distribute *The March Issue*.  Superintendent Pastel denied permission to distribute *The March Issue* on ICSD grounds and stated:

> As you are aware, [*The March Issue*] includes the cartoon that is the subject of *The Tattler*'s current appeal.  I have concluded that distribution of this cartoon would cause material and substantial interference with the educational operation of Ithaca High School.  The cartoon is unfit for distribution to students in the High School.[20]

On the same day, March 8, 2005, R.O. challenged Superintendent Pastel's decision to deny distribution of *The March Issue*.  R.O. stated that, "the *Tinker* ruling requires that the District substantiate the risk to operation of the school that printing a cartoon in a spread about censorship would create - declaring that the disruption would exist is not sufficient".

On March 9, 2005, Superintendent Pastel reconfirmed her decision to deny distribution of *The March Issue*.   Superintendent Pastel cited her decision on *The Tattler* appeal and further stated that:

> I believe that the cartoon at issue is obscene, and further that its distribution would be offensive to many students and confusing to others, particularly immature students whose understanding of and views about sexual relations are not fully formed.  Further, its distribution would interfere with teaching of the current health curriculum, in particular that sexual relations is a matter to be taken seriously.

The student publishers of *The March Issue* created two more independent newspapers entitled *The April Issue* and *The May Issue*.  The publishers of the newspapers sought and were granted permission to distribute those newspapers on ICSD grounds.

---

[20] Superintendent Pastel also denied permission based upon the fact that the publication contained privileged mental health information about a faculty member.  However, this disputed information was removed and Superintendent Pastel withdrew her denial on that basis.

15

On May 11, 2005, Roselyn Teukolsky accepted the position of Faculty Advisor for *The Tattler*.[21]  Once Ms. Teukolsky became Faculty Advisor, the staff of *The Tattler* was permitted to use *The Tattler* name, office and IHS resources.  In June 2005, an issue of *The Tattler* was published which contained a front page article about the lawsuit herein entitled "*Tattler* Editors File Suit to Stop Censorship".

Plaintiffs filed the within action on June 3, 2005 alleging five separate causes of action. (Dkt. No. 1).  Plaintiffs claim that defendants censored material in violation of their First Amendment and Fourteenth Amendment rights.  Second, plaintiffs contend that the requirement that plaintiffs submit articles to a faculty advisor for final approval violated the established practices of *The Tattler* and plaintiffs' First Amendment rights.  Third, plaintiffs assert that defendants' actions in preventing the distribution of an independent newspaper violated plaintiffs' First Amendment right of Freedom of the Press.  Fourth, plaintiffs seek a declaratory judgment that the Guidelines for *The Tattler* are unconstitutional.  Finally, plaintiffs' seek to enjoin defendants from adopting and implementing the Guidelines.  Plaintiffs also seek costs and attorney fees.  (Dkt. No. 1).  Defendants filed the within motion seeking summary judgment and dismissal of plaintiffs' complaint.  (Dkt. No. 32).

## DISCUSSION

### I.    Mootness

Before addressing the merits of the case, the Court is compelled to consider defendants contention that the individual declaratory claims are moot.  Defendants argue that since all plaintiffs have graduated from IHS, plaintiffs claims for injunctive and declaratory relief

---

[21] Ms. Teukolsky was the Faculty Advisor for *The Tattler* at the time the motion papers were filed.

(plaintiffs' fourth and fifth causes of action) have been mooted.[22]   Plaintiffs argue that the claims

fall within the "capable of repetition, yet evading review" exception to the mootness doctrine.

Mootness is a threshold issue because the existence of a live case or controversy is a

constitutional prerequisite to federal court jurisdiction.  *Lane v. Simon*, 495 F.3d 1182, 1186 (10th

Cir. 2007) (internal citation omitted).  The mootness doctrine ensures that the litigant's interest in

the outcome continues to exist throughout the life of the lawsuit.  *U.S. Parole Comm'n v.

Geraghty*, 445 U.S. 388, 395 (1980).  Mootness does not impact a plaintiff's claim for monetary

damages. *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (internal citations omitted).

An exception to the mootness doctrine exists in situations "capable of repetition, yet

evading review".  *Cook*, 992 F.2d at 20; *see also Weinstein v. Bradford*, 423 U.S. 147, 148-49

(1975) (per curiam).   In the absence of a class action, this exception to mootness applies only if:

"(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or

expiration, and (2) there was a reasonable expectation that the same complaining party would be

subjected to the same action again." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982).  Both prongs of

the exception must be present.  *Cook,* 992 F.2d at 20.

In general, a student's graduation from school will render their individual declaratory

claims moot. *Ford v. Reynolds*, 326 F.Supp.2d 392, 406 (E.D.N.Y. 2004) (citing *Fox v. Bd. of Tr.

of the State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994.  However, the Second Circuit has

suggested that, in certain instances, a student's claim may not be rendered moot by graduation if

she sued in a "representational capacity" as the leader of a student organization.  *Cook*, 992 F.2d

at 20 (citing *Brandon*, 635 F.2d at 973).  In that instance, the suit may survive even after the

---

[22] Defendants do not argue that plaintiffs' claims for compensatory damages have been mooted.  Plaintiffs'
First, Second and Third causes of action seek monetary damages.

plaintiff ceases to have a legally cognizable interest in the outcome. *Muhammad v. City of N.Y. Dep't of Corr.*, 126 F.3d 119, 124 (2d Cir. 1997).

In the case of *Trachtman v. Anker*, 563 F.2d 512, 514 (2d Cir. 1977), the Second Circuit discussed the issue of mootness in a similar context. The plaintiff was the editor-in-chief of the high school newspaper but had recently graduated. *Id*. at 514. Although the complaint did not formally assert that the plaintiff was litigating in a representational capacity, the Court concluded that the plaintiff sought to vindicate not only his rights but the rights of the newspaper staff. *Id.* at 514, n.1. The complaint requested relief on behalf of the plaintiff and "other [sic] similarly situated". *Id.* The Court noted, "the fact that Trachtman may no longer be a student at Stuyvesant does not moot the case as we have no doubt there is a proper adversary relationship here to assure proper presentation of the issues". *Trachtman*, 563 F.2d at 514. The court held that the action was not rendered moot since the plaintiff was acting on behalf of the student association and its members, both of whom had a continuing stake in the litigation. *Id*.

The facts of the case at hand are analogous with *Trachtman*. At the time the complaint was filed, plaintiffs were students at IHS.[23] Each plaintiff was identified in the complaint not only as an IHS student, but also as a member of the staff/editorial board of *The Tattler*. Although plaintiffs did not formally sue in their representational capacities, the complaint contains allegations and seeks relief for other similarly situated students. The complaint alleges, in pertinent part:

37.   Defendants are acting under color of law and by virtue of the policy imposed
      by defendant Ithaca City School District to censor, impede and prevent

---

[23] The summons and complaint were filed on June 3, 2005. The last issue of *The Tattler* for the 2004-2005 academic year was published on June 8, 2005. The record indicates that all plaintiffs graduated in "June 2005". The exact date of plaintiffs' graduation is not contained within the record.

plaintiffs and others from exercising their constitutional rights to free speech and freedom of the press, and the right to write, edit and distribute *The Tattler* as previously approved as a public form.

56.  If defendants are not enjoined from adopting and implementing the guidelines, the guidelines will continue to have a chilling effect on plaintiffs' and others' First Amendment rights to free speech, free expression and freedom of the press.

57.  If defendants are not enjoined from implementing the guidelines, plaintiffs and others will suffer a direct and immediate injury to their rights to free speech.

Accordingly, plaintiffs should be considered as acting on behalf of members of *The Tattler* staff who have a continuing stake in this litigation.  The Court finds that the inference of a continuing controversy warrants a decision on the merits.  Consequently, the within action has not been rendered moot.[24]

## II.  Summary Judgment Standard

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See id*.  If the nonmovant fails to carry this burden, summary judgment is appropriate.  *See id*.

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other

---

[24] Although plaintiffs attempt to apply the exception to the mootness doctrine, the Court has determined that the claims are not moot.  Therefore, the Court will not engage in an analysis of the exception.

documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen 'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

## III.    Nature of Forum

The level of scrutiny that must be applied to actions inhibiting speech depends on the nature of the forum in which the speech occurs.  *See Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207, 211 (2d Cir. 1997).   Fora for expression are classified in four categories which "correspondingly fall along a spectrum of constitutional protection", *Peck v. Baldwinsville Cent. Sch. Dist*., 426 F.3d 617, 625 (2d Cir. 2005), from highest to lowest: the traditional public forum; the designated public forum, and its subset, the limited public forum; and the non-public forum.  *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142-43 (2d Cir. 2004).  The traditional public forum is comprised of streets, parks and areas "which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts, between citizens, and discussing public questions.  *Peck*, 426 F.3d at 620 (citing *Make the Rd. by Walking, Inc*., 378 F.3d at 142).  In a public forum, the state may make content-based restrictions only if those rules are "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end.  *Id.* at 142 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

A nonpublic forum is government property that has not been opened for public speech either by tradition or by designation. *Perry*, 460 U.S. at 46.   In such a forum, the government may make a distinction in access on the basis of subject matter and speaker identity and "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Id*.  In nonpublic forums, the government may make "time, place and manner restrictions and 'reasonable' content-based regulations." *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991).  Thus, courts will "uphold a governmental restriction on speech in a nonpublic forum as long as the restriction is reasonable and viewpoint-neutral." *Perry v. McDonald*, 280 F.3d 159, 169 (2d Cir. 2001) (citing *Perry*, 460 U.S. at 46).

A 'designated public forum' is a place not traditionally open to public assembly and debate - a public school, for example - that the government has taken affirmative steps to open for general public discourse.  *Peck*, 426 F.3d at 626.  A limited public forum is created when the state "opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects".  *Hotel Employees & Rest. Employees Union Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (internal citation omitted).   Rules governing the content of speech in a limited public forum must be reasonable and viewpoint neutral.  *Id*. at 545-546.  In a limited public forum, the government may enforce reasonable time, place, and manner restrictions on speech so long they are "'justified without reference to the content of the regulated speech,' ... 'narrowly tailored to serve a significant governmental interest,' and 'leave open ample alternative channels for communication.' "

*Cornelius v. NAACP Legal Def. and Educ. Fund, Inc*., 473 U.S. 788, 818 (1985) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

To determine the type of forum, the Court must examine "the policy and practice of the government" and "the nature of the property and its compatibility with expressive activity." *Cornelius*, 473 U.S. at 802. In conducting this analysis, the Court must "ascertain whether [the government] intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.*

Generally, school facilities are nonpublic forums. *Cf. Hazelwood Sch. Dist. No. 403 v. Kuhlmeier*, 484 U.S. 260, 267 (1988) ("[S]chool facilities may be deemed to be public forums only if school authorities have by policy or practice opened those facilities for indiscriminate use by the general public or by some segment of the public.... If the facilities have instead been reserved for other intended purposes, communicative or otherwise, then no public forum has been created ....") (internal quotations omitted). When a school clearly retains control over every aspect of the production and publication of a school newspaper and its contents, it has not created a designated public forum. *Hazelwood*, 484 U.S. at 268. However, "in a situation where the editors are empowered to make their own decisions, wise or foolish, without fear that the administration would stop the presses, a designated public forum has been created". *Hosty v. Carter*, 412, F.3d 731, 738 (7th Cir. 2005) (holding that even though the parties disagreed about the role of the faculty advisor of a college newspaper, taking the evidence in a light most favorable to the students, the defendants created a designated public forum).

In determining whether school officials intended to open a publication to indiscriminate use, the significant factors are: (1) whether the school district and its principals treated all

publications similarly; (2) whether the intent is most clearly evidenced by written policies that explicitly reserve the right to control content; and (3) whether their practices were not inconsistent with these policies.  *Planned Parenthood of S. Nevada, Inc. v. Clark County Sch. Dist.*  941 F.2d 817, 823-824 (9th Cir. 1991) (holding that the school district showed an affirmative intent to retain editorial control and responsibility over all publications and advertising disseminated under the auspices of its schools).

    In the case at hand, defendants argue that *The Tattler* was a non-public forum for public expression.[25]  Plaintiffs claim that the ICSD, through policy and practice, recognized *The Tattler* as an open forum.  Plaintiffs cite to the editorial page of *The Tattler* and *The Tattler* Staff Handbook.[26]   The Court finds that both arguments are unsupported by the record.  Despite the language in the masthead, there is no evidence that defendants clearly intended to create a public forum by opening *The Tattler* to indiscriminate use. The  ICSD policy with respect to the newspaper was set forth in the Student Conduct Manual.  The Manual states that, "newspaper staff members and editors must refrain from libel and obscenity or from distributing materials that would materially and substantially interrupt the educational process or intrude upon the rights of others".  There is no evidence that defendants deviated from that policy.  The record provides evidence that the ICSD exercised its authority to control the content of written material in *The Tattler*, even before the Guidelines were implemented in January 2005.

---

[25] Defendants argue that, "the ICSD intended for *The Tattler* to be, and maintained *The Tattler* as, a nonpublic forum."  For the purposes of this motion, the Court assumes defendants argument pertains to the nature of expression in the newspaper both historically and subsequent to the enactment of the Guidelines.

[26] As previously noted, the masthead in the May 2001 and January 2005 issues of *The Tattler* stated that the newspaper was "an open forum".  That language was not included in the mastheads of the February 2005 and June 2005 issues of *The Tattler*.  Plaintiffs also allege that on or around 1996, *The Tattler* Staff Handbook described the newspaper as an open forum.  The Court is unable to address this argument as the Handbook is not part of the record herein.

Conversely, *The Tattler* cannot be described as a nonpublic forum.  The parties dispute and submit conflicting evidence regarding the role of the Faculty Advisor.  Ms. Bach stated that the final decisions with respect to article ideas and content were made by the editorial staff and editor-in-chief with an exception for certain cases.  Ms. Vinch testified that she perceived her authority as "final say over what was published" and the Guidelines vest the Faculty Advisor with such control.  However, the members of *The Tattler* staff believed that the student editors of *The Tattler*, "with the advice of the Faculty Advisor, exercised final control over editorial and content decisions".  Regardless, the record demonstrates that the Faculty Advisor's control and authority did not rise to the level necessary for the newspaper to be deemed a nonpublic forum.  *See Hazelwood*, 484 U.S. at 268.  Historically, the Faculty Advisor did not select the editors of the paper, assign story ideas, direct editorial/staff meetings, or select and edit the letters to the editor. The editors maintained some degree of control with regard to article ideas and selections.

The undisputed facts establish that defendants did not retain the degree of control necessary to deem *The Tattler* a non-public forum.  However, the record is devoid of any evidence establishing that defendants intended to open *The Tattler* for indiscriminate use. Therefore, the Court concludes that the ICSD created a limited public forum for the distribution of written materials in *The Tattler*.  Accordingly, defendants were permitted to make reasonable viewpoint neutral rules governing the content of *The Tattler* and enforce reasonable restrictions with respect to material written in *The Tattler*.

**IV.      Student Speech in Public Schools**

Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503,

24

506 (1969), "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986).   School officials must have some latitude within the school in punishing and prohibiting ordinarily protected speech both out of regard for fellow students who constitute a captive audience, and in recognition of the fact that the school has a substantial educational interest in avoiding the impression that it has authorized a specific expression.   *Thomas v. Bd. of Ed., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1049 (2d Cir. 1979) *cert. denied*, 444 U.S. 1081 (1980).   School administrators may regulate student expression on school property when the speech will materially and substantially disrupt the work and discipline of the school.   *Tinker*, 393 U.S. at 513.   Moreover, educators may exercise editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.   *Hazelwood*, 484 U.S. at 273.   Vulgar or offensive speech - speech that an adult making a political point might have a constitutional right to employ - may legitimately give rise to disciplinary action by a school, given the school's responsibility for "teaching students the boundaries of socially appropriate behavior." *Doninger v. Niehoff*, 527 F.3d 41, 48 (2d Cir. 2008) (citing *Fraser*, 478 U.S. at 681).

    When addressing the "reasonableness of restrictions" public school authorities impose on student expression, courts consider whether the student speech at issue is tolerated (private) expression, or promoted expression (school-sponsored).   The Supreme Court addressed the constitutionality of different forms of student speech in four relevant cases - *Tinker*, *Fraser*, *Hazelwood* and *Morse*.

    A.    ***Tinker v. Des Moines Independent Community Sch. Dist.***

In the case of *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), the Supreme Court discussed "personal expression that happens to occur on school premises".  In *Tinker*, the plaintiffs were high school students who were suspended from school for wearing black armbands to school in opposition to the Vietnam War.  *Id*. at 504.  The Supreme Court held that the First Amendment did not allow the school district to silence the students:

> The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others. But conduct by the student, in class or out of it, which for any reason-whether it stems from time, place, or type of behavior-materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Id*. at 512-13 (internal footnote, quotation marks, and citation omitted).  The rule of *Tinker* has come to mean that a school may not regulate student expression unless the regulation may be "justified by a showing that the student['s] [speech] would materially and substantially disrupt the work and discipline of the school.  *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 325 (2d Cir. 2006) (citing *Tinker*, 393 U.S. at 513).

**B.      *Bethel Sch. Dist. No. 403 v. Fraser***

In *Fraser*, the Court explored the issue of whether or not the First Amendment prevented a school district from disciplining a student for giving an offensively lewd and indecent speech. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 677 (1986).  The speech was given during an assembly that was part of a school-sponsored educational program in self-government.  *Id.*

Approximately 600 students attended the assembly, including many 14 year-olds. *Id*. During the speech, the plaintiff referred to a candidate in terms of an elaborate, graphic and explicit sexual metaphor. *Id*. at 678. The plaintiff was subsequently suspended from school for three days and filed suit alleging that his First Amendment right to freedom of speech had been violated. *Id.* at 679.

The Court distinguished the matter from the *Tinker* case noting that the plaintiff's speech was unrelated to any political view. *Id.* at 685. The Court cited to prior Supreme Court decisions on First Amendment jurisprudence and acknowledged that, "limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children". *Fraser*, 478 U.S. at 684 (internal citations omitted). The Court recognized an interest in protecting minors from exposure to vulgar and offensive spoken language. *Id.* (citing *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978) (holding that the broadcast of words depicting sexual and excretory activities were considered obscene, indecent or profane within the violation of a federal statute prohibiting the broadcasting of obscene language).

*Fraser* also observed that vulgar or offensive speech may give rise to disciplinary action by a school given the school's responsibility for teaching students the boundaries of socially appropriate behavior. *Id.* The Court reasoned that it is "a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse". *Id*. at 683. Moreover, the determination of what manner of speech in the classroom or in school assembly is inappropriate rests with the school board. *Fraser*, 478 U.S. at 683. The Court concluded that the sexual innuendo in the plaintiff's speech was plainly offensive to both teachers and students and

"could well be seriously damaging to its less mature audience, many of whom were only 14 years old and on the threshold of awareness of human sexuality". *Id.* The Court acknowledged "the obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children - especially in a captive audience-from exposure to sexually explicit, indecent, or lewd speech". *Id.*

> The Supreme Court concluded:

> We hold that petitioner School District acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech. Unlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were unrelated to any political viewpoint. The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission. A high school assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students. Accordingly, it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the "fundamental values" of public school education.

*Id.* at 685-686.

### C.     *Hazelwood v. Kuhlmeier*

In *Hazelwood*, the Supreme Court explored the issue of whether the First Amendment requires a school to affirmatively promote particular student speech. *Hazelwood*, 484 U.S. at 261. The plaintiff's were former staff members of the high school newspaper, *Spectrum*, and alleged that their First Amendment rights were violated by the deletion of two pages from an issue of the newspaper. *Id*. at 263. The two pages contained articles that described students' experiences with pregnancy and divorce. *Id*.

The Supreme Court distinguished the issues presented in *Hazelwood* from the *Tinker* case and explained:

28

The question whether the First Amendment requires a school to tolerate particular student speech-the question that we addressed in *Tinker*-is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.

*Id*. at 270-71.

The Court concluded that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored activities so long as their actions are reasonably related to legitimate pedagogical concerns. *Hazelwood*. Quoting the decision in *Fraser*, the Court noted:

A school must be able to set high standards for the student speech that is disseminated under its auspices-standards that may be higher than those demanded by some newspaper publishers or theatrical producers in the "real" world-and may refuse to disseminate student speech that does not meet those standards. In addition, a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting. A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with "the shared values of a civilized social order,"(citation omitted), or to associate the school with any position other than neutrality on matters of political controversy.

29

*Hazelwood,* 484 U.S. at 271-272.  Thus, the Court held that the defendants' decision to delete two pages of *Spectrum* was reasonable under the circumstances.  *Id.* at 572.

**D.    *Morse v. Frederick***

In *Morse v. Frederick,* ---- U.S. ---- , 127 S.Ct. 2618 (2007), the Court was presented with the issue of whether or not the principal of a high school properly restricted student speech promoting illegal drug use at a school event.  The principal of a high school in Alaska decided to permit the staff and students to participate in the Olympic Torch Relay which passed through Juneau as an approved social event or class trip.  *Id.* at 2622.  While outside, the principal observed some students unfurl a large banner with the phrase: BONG H!TS 4 JESUS.  *Id.*  The defendant confiscated the banner and suspended the student.  *Id.*  The plaintiff brought suit claiming that the school violated the student's First Amendment rights.

In the opinion, the Court provided an extensive analysis of the serious problem of drug abuse among the nation's youth.  Morse, at.  The Court noted that pursuant to the prior decisions in *Fraser* and *Hazelwood*, the mode of analysis set forth in *Tinker* is not absolute.  *Id.* at 2627. The Court examined the principals in the prior speech cases and found that deterring drug use by schoolchildren was an important and compelling interest.  *Id.* at 2628.

The Court held that:

> The "special characteristics of the school environment," (citation omitted), and the governmental interest in stopping student drug abuse-reflected in the policies of Congress and myriad school boards, including JDHS-allow schools to restrict student expression that they reasonably regard as promoting illegal drug use. *Tinker* warned that schools may not prohibit student speech because of "undifferentiated fear or apprehension of disturbance" or "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." (citation omitted).  The danger here is far more serious and palpable. The particular concern to prevent student drug abuse at issue here, embodied in established school policy [], extends well beyond an abstract desire to avoid controversy.

*Morse*, 127 S.Ct. at 2629.  The Court rejected the defendant's attempt to apply the *Fraser* analysis

to the plaintiff's speech.  The Court stated that *Fraser* did not extend to encompass any speech

that could fit under some definition of "offensive".  *Morse*, 127 S.Ct. at 2629.  The Court held the

school officials did not violate the First Amendment by suspending the plaintiff as the First

Amendment does not require schools to tolerate student expression at school events that

contributes to the dangers of illegal drug use.  *Id.*

## V.    Nature of Speech

In the case at hand, the parties disagree on the nature of the disputed speech.  With the

principals outlined in the seminal Supreme Court cases in mind, the Court must consider the

nature of the speech.  Defendants argue that the stick figure drawings were lewd, vulgar and

obscene.  Defendants claim that based upon *Fraser* and the Second Circuit holding in *Guiles*, the

decision to deny publication of the drawings did not violate plaintiffs' First Amendment rights.

Defendants further contend that *The Tattler* was a school-sponsored publication which members

of the public would reasonably perceive to bear the imprimatur of the ICSD.

Plaintiffs claim that the cartoon was not obscene or plainly offensive.  Plaintiffs also argue

that in *Guiles*, "the Second Circuit [] erred in applying the analysis of *Fraser* to images and

printed words".   Plaintiffs' contend that the rule of *Tinker* applies because *The Tattler* was not a

school-sponsored newspaper and did not bear the imprimatur of the school.

### A.    Pedagogical Concerns

Defendants contend that the decision to deny publication of the cartoon in *The Tattler* was

reasonably related to a legitimate pedagogical concern.  Defendants claim that if the cartoon was

published in *The Tattler*, students would have the impression that the ICSD did not consider sex a

31

serious subject.  Further, defendants argue that the decision was made to protect the students from obscene material.  Plaintiffs argue that defendants' actions were unrelated to any legitimate pedagogical concern.  Plaintiffs claim that the cartoon was to accompany a serious article that examined the ICSD curriculum.  Plaintiffs also contend that the issue of whether or not the cartoon was obscene is a question of fact precluding summary judgment.

The universe of pedagogical concerns is by no means confined to the academic . . . [for it] includes discipline, courtesy and respect for authority.  *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989).  *Poling* provides:

> Local school officials, better attuned than we to the concerns of the parents/taxpayers who employ them, must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted. We may disagree with the choices, but unless they are beyond the constitutional pale we have no warrant to interfere with them.  Local control over the public school, after all, is one of this nation's most deeply rooted and cherished traditions.

*Poling*, 872 F.2d at 762 -763 (citing *Milliken v. Bradley*, 418 U.S. 717, 741-42 (1974)).  A school district's desire to avoid controversy within a school environment is sufficient to satisfy the pedagogical test.  *Brody v. Sprang*, 957 F.2d 1108, 1122 (3d Cir. 1992) (holding that school officials reasonably may prohibit all religious speech at a graduation ceremony in order to avoid offending the audience).  A district has a legitimate interest in divorcing its extracurricular programs from controversial and sensitive topics, such as teenage sex, an interest that would be "brought to naught" were the school not allowed to discipline such conduct.  *Henerey*, 200 F.3d at 1136; *see also Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 753 (8th Cir. 1987) (holding that school boards have the power to prohibit the introduction of written material pervaded or characterized by four-letter words that used to be considered unprintable).

32

It is clear from *Hazelwood* that school officials may consider the emotional maturity of the intended audience in determining the appropriateness of potentially sensitive topics such as sex and vulgarity. *Virgil v. Sch. Bd. of Columbia County, Fla.*, 862 F.2d 1517, 1523 (11th Cir. 1989) (holding that school board was motivated by legitimate concerns when the board decided to remove a sexually explicit and vulgar textbook from the curriculum). Assuming a general standard of reasonableness, the task of assessing the limits on vulgarity in schools should be defined by school administrators, answerable to school boards and ultimately to the voters of a community. *Pyle By and Through Pyle v. S. Hadley Sch. Comm.*, 861 F.Supp. 157, 169-170 (D. Mass.1994) (citing *Poling*, 872 F.2d at 762). The ultimate authority to determine " 'what manner of speech in the classroom . . . is inappropriate properly rests with the school board,' rather than with the federal courts." *Hazelwood*, 484 U.S. at 267, (quoting *Fraser*, 478 U.S. at 683).

The Second Circuit has held that, "[w]e believe that the school authorities are sufficiently experienced and knowledgeable concerning these matters, which have been entrusted to them by the community; a federal court ought not impose its own views in such matters where there is a rational basis for the decisions and actions of the school authorities". *Trachtman v. Anker*, 563 F.2d 512, 519 (2d Cir. 1977) (holding that defendants reasonably prevented the distribution of a sex questionnaire to "protect the students committed to their care, who are compelled by law to attend the school, from peer contacts and pressures which may result).

Plaintiffs contend that the Second Circuit arguably erred in applying the holding of *Fraser* to images and printed words in *Guiles*. In *Guiles*, the plaintiff, a middle school student, wore a t-shirt to school that contained several statements critical of President George W. Bush. The relevant images were pictures of lines of cocaine and a martini glass. *Id.* at 322. After continued

warnings, the plaintiff covered the images of drugs and alcohol with duct tape and scrawled the word "censored". *Id.* at 323. The plaintiff then brought suit to enjoin the defendants from enforcing the school dress code with regard to his t-shirt. *Guiles,* 461 F.3d at 323.

The Court found that *Hazelwood* did not apply because the school did not sponsor the plaintiff's t-shirt nor did the shirt bear the school's imprimatur. *Id.* at 327. The Court also held that the lower court misapplied *Fraser*. The Court found:

> *Fraser's* reach is not as great as the trial court presumed. *Fraser* permits schools to censor student speech that is "lewd," "vulgar," "indecent," or "plainly offensive." (citation omitted). We thus ask whether the images of a martini glass, a bottle and glass, a man drinking from a bottle, and lines of cocaine constitute lewd, vulgar, indecent, or plainly offensive speech. We think it clear that these depictions on their own are not lewd, vulgar, or indecent. Lewdness, vulgarity, and indecency normally connote sexual innuendo or profanity. *See* Merriam-Webster's Third New Int'l Dictionary 1147, 1301, 2566 (1st ed.1981) (defining (a) "lewd" as "inciting to sensual desire or imagination," (b) "vulgar" as "lewd, obscene, or profane in expression," and (c) "indecent" as "being or tending to be obscene").

*Guiles*, 461 F.3d at 327.

The Second Circuit concluded that Supreme Court holdings yield three principles: (1) under *Fraser*, a school may categorically prohibit vulgar, lewd, indecent, or plainly offensive student speech; (2) under *Hazelwood*, a school has limited authority to censor school-sponsored student speech in a manner consistent with pedagogical concerns; and (3) the *Tinker* standard applies to all other student speech and allows regulation only when the school reasonably believes that the speech will substantially and materially interfere with schoolwork or discipline. *Guiles*, 461 F.3d at 325.

The Court analyzed whether or not the images were "plainly offensive" and determined that the definition of "plainly offensive" for the purposes of *Fraser* "must . . . be somewhat narrower than the dictionary definition". *Id.* at 328. The Court concluded:

34

> Courts that address *Fraser* appear to treat "plainly offensive" synonymously with and as part and parcel of speech that is lewd, vulgar, and indecent-meaning speech that is something less than obscene but related to that concept, that is to say, speech containing sexual innuendo and profanity. (citations omitted). In fact, the Supreme Court deemed Fraser's speech could be freely censored because it was imbued with sexual references, bordering on the obscene. (citation omitted).

*Guiles* at 461 F.3d. at 328.

The Court concluded that the images of a martini glass, alcohol and lines of cocaine, "may cause school administrators displeasure and could be construed as insulting or in poor taste", however the images were not, "as plainly offensive as the sexually charged speech considered in *Fraser* nor are they as offensive as profanity used to make a political point". *Id.* at 329.

In determining that *Tinker* applied, the Second Circuit stated:

> for all [] speech, meaning speech that is neither vulgar, lewd, indecent or plainly offensive under Fraser, nor school-sponsored under Hazelwood, the rule of Tinker applies. Schools may not regulate such student speech unless it would materially and substantially disrupt classwork and discipline in the school.

*Guiles*, 461 F.3d at 325. Accordingly, the Court found that the censorship was unconstitutional as the substantial disruption test was not satisfied. *Id.* at 331.

Plaintiffs' argue that *Fraser* explicitly restricts its holding "to the authority that high school officials have to restrict a high school student's use of disruptive language in a speech given to a high school assembly". However, plaintiffs have failed to cite to any case law within the Second Circuit, or any other Circuit, that questions or contradicts the reasoning and holding of *Guiles*.[27] Other district courts have extended *Fraser* beyond the realm of spoken speech. In *Pyle*

---

[27] In a recent decision, the District Court in New Jersey concluded, "[a]s it appears that the Third Circuit has not decided on *Fraser* directly, this Court finds the interpretation set forth in *Guiles* is a purer distillation of the Supreme Court precedent". *DePinto v. Bayonne Bd. of Educ.*, 514 F.Supp.2d 633, 644 (D.N.J. 2007).

*By and Through Pyle v. S. Hadley Sch. Comm.*, 861 F.Supp. 157, 169-170 (D. Mass.1994), the district court applied the *Fraser* analysis to the plaintiff's t-shirts which read, "See Dick Drink. See Dick Drive. See Dick Die. Don't be a Dick" and "Coed Naked Band: Do It To the Rhythm". The court held that the "sexual witticism at issue in this case is almost identical in tone to the student's remarks reported in *Fraser*". *Pyle*, 861 F.Supp. at 159.

In the recent case of *Doninger v. Niehoff*, 527 F.3d 41, 49 (2d Cir. 2008), the Second Circuit addressed a school's decision with regard to a posting on an independently operated, publicly accessible web log (or "blog"). Plaintiff, a high school student, posted a message calling school administrators "douchebags" and encouraging others to contact the school superintendent "to piss her off more". *Doninger,* 527 F.3d at 49. The Court analyzed the posting and noted that if the plaintiff had distributed the electronic posting as a handbill on school grounds, "this case would fall squarely within the Supreme Court's precedents recognizing that the nature of a student's First Amendment rights must be understood in light of the special characteristics of the school environment and that, in particular, offensive forms of expression may be prohibited". *Doninger*, 527 F.3d at 49 (citing *Fraser*, 478 U.S. at 682-83). The Court reasoned that *Fraser* did not justify restricting a student's speech merely because it is inconsistent with an educator's sensibilities; its reference to "plainly offensive speech" must be understood in light of the vulgar, lewd, and sexually explicit language that was at issue in that case. *Doninger*, 527 F.3d at 49. The Court held that the posting contained the sort of language that properly may be prohibited in schools and concluded, "[the plaintiff's] language, had it occurred in the classroom, would have fallen within *Fraser* and its recognition that nothing in the First Amendment prohibits school authorities from discouraging inappropriate language in the school environment". *Id*. at 49.

36

In the case at hand, the record establishes that plaintiffs intended the cartoon to accompany an article entitled "How Sex is Being Taught in Our Health Class?". Plaintiffs claim, and defendants agree, that the article was meant to be serious examination of health education in the ICSD. Therefore, plaintiffs argue that it was unreasonable for defendants to conclude that by publishing the cartoon, *The Tattler* would send an inconsistent message about sex. Based upon the record, no reasonable fact finder could accept that rationale. When presented with a copy of the cartoon, plaintiff R.O. testified that he viewed the stick figure drawing as "funny" and stated that, "I actually burst into actual laughter when I saw what [] had been submitted in response to our concerns". Given this contradiction, it was clearly reasonable for defendants to conclude that if the "funny" cartoon was printed alongside a serious article, an inconsistent message would be communicated.[28]

Beyond the contradictory message, defendants expressed additional concerns about the cartoon and the possible effect it would have on the student body. Superintendent Pastel upheld the prior decisions by Ms. Vinch and Principal Wilson and refused to allow the publication of the stick figure cartoon. Superintendent Pastel stated that the cartoon would "substantially interfere with the work of the school and impinge upon the rights of other students". Moreover, Superintendent Pastel opined that the cartoon "would raise inappropriate questions in the minds of many immature students and interfere with what is being taught in the health curriculum regarding both responsibility and abstinence". In an affidavit, Superintendent Pastel explained that her decision was motivated, "at least in part, by my knowledge of a recent trend in risky sexual behavior ICSD students were engaging in at this time". Superintendent Pastel perceived

---

[28] The article was published, in its entirety, in the February 2005 issue.

that it was "incumbent upon [her], as Superintendent of a school district where students were not taking sexual relations seriously . . . to maintain a consistent position that sexual relations are to be taken seriously, as today sex can often be a matter of life and death".  With regard to the risky behavior, Superintendent Pastel stated:

> In January and February of 2005, I became aware of an increasing number of ICSD students who were engaging in risky sexual behavior and drug use.  This came to my attention after several community leaders, a Board member and staff members approached me with their concerns.  There were middle school student parties with boys standing in a line while the girls knelt going down the line orally "servicing" them.  The female students told adults their actions did not constitute "sex".  Some students allegedly were being recruited and pressured to engage in group sex and sexual behavior with multiple partners.  The problem became so severe that the secondary principals and I wrote a letter to all parents of ICSD secondary students alerting them to the ICSD's concerns.

> Accordingly, it was the District's position that printing a drawing that makes light of sexual relations and mocks the ICSD's health education program in an ICSD publication would undermine the District's concerted effort to stress to students and parents the seriousness of sexual relations, as well as diminish the District's efforts to put forth a health curriculum that stresses sex education, including abstinence.

It is undisputed that the cartoon depicted stick figures in various sexual positions.  After reviewing the cartoon, several school officials offered their opinion of the drawing. Ms. Vinch found the drawing, "lewd, vulgar and obscene, and therefore inappropriate for publication in *The Tattler*, as *The Tattler* is read by students as young as twelve or thirteen years old".  Superintendent Pastel has been Superintendent for the ICSD since 1996 and deemed the drawing to be obscene.  As stated previously, Superintendent Pastel opined that distribution would be offensive and confusing to many students, particularly immature students.

Upon reviewing the cartoon, Principal Wilson noted that it, "depicted stick figures apparently engaged in various sex acts, I thought it obscene and not suitable for immature student audiences".  Principal Wilson earned a Bachelor's Degree in history from Amherst College, a

Masters Degree in Education from the University of Pennsylvania, a Masters Degree in Public

Administration from Harvard University, and a Juris Doctor from the University of Southern

California.   Principal Wilson provided an affidavit stating:

> In my mind, this audience included the 20 or so seventh and eighth graders taking classes on our campus and the 800-plus 13, 14 and 15 year-olds in our 9th and 10th grades.   I also thought publishing the cartoon would be inconsistent with the educational mission and the pedagogical concerns of the District.   In reaching these conclusions, I considered the fact that issues of *The Tattler* were delivered to every classroom in the school as well as to all public areas in the school.   Typically, papers were scattered throughout the halls, the building and over the campus shortly after delivery.   Moreover, each issue was widely distributed to many restaurants, kiosks and other public gathering places throughout the community, and each issue was also posted online.

In opposition to defendants' motion, plaintiffs' provided excerpts of the deposition

transcript of R.O.  R.O testified that he thought the stick figure drawing was "funny" and he did

not deem the drawing obscene.  Plaintiffs offer no evidence or testimony from any expert or

school official contradicting the opinions and conclusions of defendants.  Plaintiffs provided an

affidavit from Ms. Bach however, the affidavit is devoid of any reference to the subject cartoon.

The record supports defendants' decision to deny publication of the cartoon in *The Tattler* as

related to a legitimate pedagogical interest.  Accordingly the Court concludes that defendants had

a rational basis for the decision to deny publication of the cartoon to avoid a substantial risk of

disruption of school activities.  *See Frasca v. Andrews*, 463 F.Supp. 1043, 1051 (E.D.N.Y. 1979)

(holding that the opinions offered by professionals having extensive experience with students of

comparable age and maturity provided a rational basis for defendants' determination and thus,

there was no basis for court intervention).  It was reasonable for defendants to conclude that if the

stick figure cartoon was published, it would further aggravate an already volatile situation

regarding the sexual behavior of students in the ICSD.  As in *Morse*, the danger perceived by

defendants was "palpable and serious". Without engaging in a lengthy discussion regarding the sexual proclivities of youth in the nation and in the Ithaca community, the Court is persuaded by the reasoning of *Morse* - specifically, that the ICSD had an undeniably compelling interest in deterring students from risky sexual conduct.

Under *Fraser*, a school may **categorically** prohibit vulgar, lewd, indecent or plainly offensive speech. *See Guiles*, 461 F.3d at 325 (emphasis supplied). The record establishes that defendants had a legitimate pedagogical concern. Accordingly, the Court will defer to the ICSD and the educators in the ICSD and will not substitute the Court's opinion or criticize defendants' decision that publishing the cartoon would cause disruptions within the educational process and would be damaging to an immature audience. *See Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 559 F.Supp.2d 415, 424 (S.D.N.Y. 2008).

**B.    Imprimatur**

Assuming that *Fraser* did not apply to the facts herein, the Court considers whether *The Tattler* may be characterized as school-sponsored in order to bring this case within the purview of *Hazelwood*. The Supreme Court has recognized that school administrators may exercise authority over "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school". *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 723 (2d Cir. 1994) (quoting *Hazelwood*, 484 U.S. at 271). Activities may be defined as curricular, even outside of the traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences. *Hazelwood*, 484 U.S. at 271. The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the

40

speech. *Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918, 925 (10th Cir. 2002). The level of involvement of school officials in organizing and supervising an event affects whether that activity bears the school's imprimatur. *See Planned Parenthood of S. Nev.,* 941 F.2d at 828-29.

The Circuit Courts have analyzed the scope of *Hazelwood* in this regard. The Fourth and Eighth Circuits have held that in determining whether challenged speech is school-sponsored and bears the imprimatur of the school, a reviewing court must examine whether it has been so closely connected to the school that it appears that the school is somehow sponsoring the speech. *Lee v. York County Sch. Div*., 484 F.3d 687, 698 (4th Cir. 2007) (holding that materials posted on a classroom bulletin board by a high school teacher were school-sponsored bearing the imprimatur of the school); *Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist*., 200 F.3d 1128, 1133 (8th Cir. 1999) (members of the public could reasonably conclude that campaign materials dispensed by the student candidates in connection with a student council election were distributed with the implied consent of the school).

In *Bannon v. Sch. Dist. of Palm Beach County*, 387 F.3d 1208, 1214 (10th Cir. 2004), the Tenth Circuit held that murals that were created as part of a beautification project and displayed in prominent locations around the school constituted school-sponsored expression within the meaning of *Hazelwood*. In *Bannon*, the project was approved by the school principal, supervised by a faculty member and subject to the school's editorial control. *Id*. at 1214. Thus, the Tenth Circuit held that the project occurred in a curricular context and constituted school-sponsored expression. *Id*. The court disagreed with the plaintiff's strict interpretation of *Hazelwood* concluding that *Hazelwood* never defined curricular activities in terms of whether student

41

participation was required, earned grades or credit, occurred during regular school hours, or required a fee. *Id.* at 1214.

The Second Circuit discussed this issue in *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617 (2d Cir. 2005). In *Peck*, the plaintiff prepared a poster for a class assignment which contained several religious images. Since it was undisputed that the poster was prepared pursuant to a class assignment, the Court held that the poster fell within the *Hazelwood* framework. However, the Court was also persuaded by the fact that, "the posters were to be displayed at a school-sponsored assembly, to take place in the school cafeteria, to which parents of the kindergarteners were invited". *Peck*, 426 F.3d at 629.

In the case at hand, defendants claim that the ICSD provided financial support to *The Tattler* and that the newspaper was indirectly part of the IHS curriculum. Defendants also contend that *The Tattler* bore the physical imprimatur of the ICSD. Plaintiffs argue that *Hazelwood* does not apply because *The Tattler* was not part of the educational curriculum and further, because defendants did not maintain a sufficient level of control and authority over *The Tattler*.

As previously stated, although the parties dispute the authority of the Faculty Advisor, there is evidence that the Faculty Advisor and defendants exercised some supervision and editorial control over *The Tattler*. Pursuant to the ICSD School Conduct Manual, defendants have the authority to regulate the distribution of materials that would materially and substantially interrupt the educational process or intrude upon the rights of others.[29] Further, Ms. Bach and Ms Vinch agreed that the Faculty Advisor had authority in cases involving articles that were libelous,

---

[29] Plaintiffs do not challenge the constitutionality of the ICSD Student Conduct Manual.

obscene or could potentially cause a violent disruption of school activities.[30]  It is undisputed that defendants had editorial control.  To wit, the decision to cancel the June 2004 issue of *The Tattler* after the May 2004 issue; the decision to deny *The Tattler* staff permission to conduct a survey of the IHS faculty without certain caveats; and the decision to cease publication of *The Tattler* in March, April and May 2005.  Clearly, *The Tattler* was an activity that occurred outside the traditional classroom setting.  However, because the ICSD provided funding, supervision and exerted some editorial control, the paper bore the imprimatur of the school.

Moreover, *The Tattler* staff took no steps to distance itself from defendants and IHS.   The masthead identifies *The Tattler* as "the student-run newspaper of Ithaca High School".  *The Tattler* bears the title "*The IHS Tattler*".  The banner identifies the mailing address of the newspaper as "Ithaca High School" and identifies the website of *The Tattler* as "ihstattler.com".  *The Tattler* staff had an office in IHS.  Even viewing the facts in a light most favorable to plaintiffs, no reasonable fact finder could conclude that *The Tattler* was anything but school-sponsored.  Indeed, the letter from the staff of Ralph Ribs criticizing the article in the January 2005 issue was received by the ICSD, not *The Tattler* staff.[31]

The undisputed evidence proves that defendants had the authority to prohibit the speech at issue and deny permission to publish the cartoon.  Schools must retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate irresponsible sex.  *See Hazelwood*, 484 U.S. at 271.  Consequently, no reasonable fact finder could disagree that

---

[30] Ms. Vinch viewed her authority as extending beyond this description and understood her duties to include "final say over the content of *The Tattler*'s articles since part of the learning process was to teach students responsible, ethical and legal journalism".

[31] The letter was addressed "To Whom It May Concern", however, the parties agree that several days after the article was published, "the District" received the letter.

43

defendants acted reasonably and within their permissible authority. Defendants' decision to prohibit the distribution of material that was vulgar, lewd, indecent and plainly offensive in a school-sponsored newspaper was not a violation of plaintiff's First Amendment rights.

### C.    Viewpoint and Content Neutrality

The Second Circuit recently concluded that "a manifestly viewpoint discriminatory restriction on school-sponsored speech is, *prima facie*, unconstitutional, even if reasonably related to legitimate pedagogical interests". *Peck*, 426 F.3d at 633. Thus, the Court must analyze whether or not defendants' decision to refuse to allow the publication of the cartoon was carried out in a viewpoint-neutral manner.

Viewpoint discrimination is a subset or particular instance of the more general phenomenon of content discrimination, in which the government targets not subject matter but particular views taken by speakers on a subject. *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 831 (1995). While the government may reasonably restrict expressive activity in a limited public forum on the basis of content, it may not do so on the basis of the speaker's viewpoint, "speech discussing otherwise permissible subjects cannot be excluded . . . on the ground that the subject is discussed from a religious viewpoint." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001); *accord Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993). However, in *Peck*, the Second Circuit held:

> Even so powerful a rule as that there must be viewpoint neutrality is subject to being trumped by the existence of a compelling state interest. And what is a compelling state interest is certainly informed by the fact of a school context and the presence of minor children. In gauging whether there is a compelling state interest though, courts must be exceedingly careful to be sure that the asserted compelling state interest is directly concerned with the state's desire to protect the children in the school and is not motivated by the wish to suppress speech the school and the state do not like.

*Peck*, 426 F.3d at 633, n. 11.

The evidence establishes that defendants' decision to deny publication of the cartoon was viewpoint neutral and reasonable.  The record does not establish that defendants would have reacted differently if presented with a cartoon depicting similar images.  There is no evidence, or allegation by plaintiffs, of any viewpoint favoritism or discrimination.  However, even if plaintiffs argued that the restrictions were not viewpoint neutral, the Court finds evidence from which a reasonable person could conclude that the cartoon raised the potential for disruption in the school. *The Tattler* was distributed throughout IHS which consisted of 9th, 10th, 11th and 12th grade students.[32]  The newspaper was also circulated to teachers in the Middle and Elementary Schools and within the Ithaca community.  Thus, defendants' concern about a disruption and the desire to protect school children was a "state interest so compelling" as to justify any potential viewpoint discriminatory censorship.

The Court notes that plaintiffs' complaint challenges defendants decision to deny publication of the cartoon in *The Tattler* in the first and second causes of action.  Specifically, plaintiffs' first cause of action alleges that defendants improperly censored material without demonstrating a substantial disruption of school activities.  Plaintiffs' second cause of action alleges that the requirement that plaintiffs submit articles to the Faculty Advisor for final approval constitutes an unconstitutional prior restraint of plaintiff's rights.[33]  Despite the passage of the Guidelines, relevant sections of the Student Conduct Manual provided defendants with the

---

[32] Principal Wilson also stated that some 7th and 8th graders took classes at IHS and that *The Tattler* was posted online.

[33] In the second cause of action, plaintiffs do not specifically cite to the Guidelines.  However, based upon the language in the complaint, the Court infers that the "requirement" refers to the Guidelines.

authority to halt distribution of materials that would materially and substantially interrupt the educational process or intrude upon the rights of others. Additionally, defendants argue that they were vested with the authority to restrict the speech at issue based upon the holdings in *Hazelwood*, *Fraser* and *Guiles*. Therefore, as the Court has concluded that the decision to deny publication of the cartoon was not a violation of plaintiffs' First Amendment rights, summary judgment and dismissal is warranted with regard to plaintiffs' first and second causes of action.[34]

**VI**.     *The March Issue*

Defendants claim that the decision to refuse to allow plaintiffs' permission to distribute *The March Issue* was based upon reasonable, viewpoint neutral rules governing the distribution of literature on school grounds by limiting the distribution to newspapers that do not contain libelous or obscene material. Further, defendants argue that the decision is supported by *Fraser*. Plaintiffs contend that defendants' refusal to allow the distribution of *The March Issue*, violated plaintiffs' First Amendment rights as defendants did not have unlimited discretion to apply their own definition of obscenity.[35] Plaintiffs claim the issue of obscenity raises "an unresolved material issue of fact".

It is reasonable for a school to require prior approval before permitting students to distribute literature that would cause a substantial disruption of or material interference with the

---

[34] The Court acknowledges defendants' evidentiary arguments with regard to the affidavits submitted in opposition to the within motion. However, even assuming evidence in a light most favorable to plaintiffs, the Court has determined that defendants are entitled to summary judgment and dismissal of plaintiffs' first and second causes of action.

[35] Plaintiffs' allege that defendants' actions in preventing the distribution of *The March Issue* constituted an "unconstitutional prior restraint on freedom of the press". The complaint contains the allegation that defendants, "did not establish that such prior restraint was based on a reasonable forecast of material and substantial disruption of school activities or an invasion of the rights of others". However, plaintiff does not present this allegation in opposition to defendants' motion.

46

normal operation of the school. *M.A.L. ex rel M.L. v. Kinsland*, 543 F.3d 841, 848 (6th Cir. 2008) (holding that the defendant's distribution policy was viewpoint and content neutral and provided clear standards against which the principal must exercise his discretion to approve or disapprove of a proposed distribution). There is nothing unconstitutional *per se* in a requirement that students submit materials to a school administration prior to distribution. *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 969 (5th Cir. 1972).

Prior restraints are traditionally the form of regulation most difficult to sustain under the First Amendment, though "the protection even as to previous restraint is not absolutely unlimited". *Bystrom*, 822 F.2d at 750 (citing *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713-20 (1931). The rule of *Tinker* provides that school administrators may prohibit student expression that will "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513. School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place. *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007).

In order to justify restraints on publications to be distributed within the confines of school property, school officials must bear the burden of demonstrating a reasonable basis for interference with student speech. *Trachtman*, 563 F.2d at 5167 (citing *Eisner v. Stamford Bd. of Educ.*, 440 F.2d 803, 810 (2d Cir. 1971)). However, school officials "need not wait for potential harm to occur before taking action. *Trachtman*, 563 F.2d at 517 (internal citation omitted). In *Trachtman*, the plaintiff sought to distribute a survey as a means of obtaining information for an article entitled "Sexuality in Stuyvesant". *Id.* at 514-515. The questions covered topics such as pre-marital sex, contraception, homosexuality, masturbation and the extent of the students' sexual

experience. *Id.* at 515.  The Second Circuit concluded that school authorities acted reasonably in deciding that the questionnaire should not be distributed as it would result in psychological harm to some students. *Id.* at 519.  The Circuit recognized the district court's holding that probable harm would come to ninth and tenth grade students and noted, "[w]e see no reason why the conclusion of the defendants that this was also true of eleventh and twelfth graders was not within their competence". *Trachtman,* 563 F.2d at 519.  The Court held that, "where school authorities have reason to believe that harmful consequences might result to students, while they are on the school premises, from solicitation of answers to questions, then prohibition of such solicitation is not a violation of any constitutional right of those who seek to solicit". *Id.* at 520.  Citing to *Eisner* and other Circuit opinions, the Court refused to impose its own views in place of those of the school authorities who were "sufficiently experienced and knowledgeable".   Where school authorities have reason to believe that harmful consequences might result to students, while they are on the school premises, then prohibition of such solicitation is not a violation of any constitutional right of those who seek to solicit. *Id.* at 519.

In this case, plaintiffs argue that "defendants do not have unlimited discretion to apply their own definition of obscenity".  In *Bystrom*, the Fifth Circuit addressed a similar contention by the plaintiff who argued that the decision of whether a writing was obscene may only be made by the court and not school authorities. *Bystrom*, 822 F.2d at 751.  The court rejected that argument and noted that, "[o]n [that] view, material obscene as to minors could be freely circulated within the school until school authorities filed suit and obtained a judicial determination that the material violated the relevant legal definition". *Id.*   The Fifth Circuit cited to the Second Circuit holding in *Eisner:*

> it would be highly disruptive to the educational process if a secondary school principal were required to take a school newspaper editor to court every time the principal reasonably anticipated [a violation of schoolboard policy with respect to publication.] Thus, we will not require school officials to seek a judicial decree before they may enforce the Board's policy.

*Bystrom*, 822 F.2d at 751 (quoting *Eisner*, 440 F.2d at 810 (footnote omitted)).

      In the case at hand, *The March Issue* was not school-sponsored and defendants do not claim that it bore the imprimatur of the school. Therefore, *Hazelwood* does not apply. ICSD policy provided that the school may regulate the distribution of literature and non-school sponsored newspapers. Specifically, the ICSD Student Conduct Manual vests the Superintendent with the authority to prevent the distribution of unofficial newspapers on school grounds that would materially and substantially interfere with the educational operation of the school.[36] Defendants denied plaintiffs the right to distribute *The March Issue* on ICSD grounds because the newspaper contained the same cartoon which defendants deemed obscene.

      No reasonable fact finder could conclude that the images were anything but obscene. However, even assuming that *Fraser* did not apply to the content of the speech, defendants' refusal to grant permission to distribute *The March Issue* was not a violation of plaintiffs' constitutional rights. Pursuant to *Tinker*, the issue to resolve is whether defendants demonstrated a basis for the conclusion that the action was taken upon a reasonable forecast that distribution of *The March Issue* would result in substantial disruption or material interference with school activities. The Court previously analyzed defendants' pedagogical concerns with regard to the cartoon and found that defendants decisions were based upon a reasonable and legitimate concerns. The same concerns expressed and established by defendants with regard to publication

---

[36] Plaintiffs have not challenged the enforceability or constitutionality of the Student Conduct Manual or ICSD policies in this regard.

of the cartoon in *The Tattler* apply to defendants' decision to deny plaintiffs' the right to distribute *The March Issue*.  Defendants have presented evidence establishing that defendants had grave concerns with regard to recent sexual trends within the ICSD community.  The record demonstrates that defendant had knowledge of specific activities that occurred during middle school parties including group sex and sex with multiple partners.  Defendants were concerned that female students lacked sufficient knowledge or were confused with regard to what activities constituted sexual relations.  The record establishes that these concerns prompted defendants to alert the parents and caregivers of secondary students of "risky sexual behavior".  Defendants reasonably concluded that the cartoon would have a harmful effect on the students and disrupt school activities.  Defendants were not required to wait until harm actually occurred to prevent the disputed speech. *See Trachtman*, 563 F.2d at 517.  Plaintiffs have failed to come forward with any evidence to negate defendants' opinion and establish that plaintiffs' request would do no more than cause "undifferentiated fear of apprehension of disturbance" which is "not enough to overcome the right to freedom of expression". *Tinker*, 393 U.S. at 509.  Consequently, based upon *Fraser* and *Tinker*, the Court finds that defendants' decision to prohibit distribution of *The March Issue* on ICSD grounds was not a violation of plaintiffs' First Amendment rights.

**VII.    *The Tattler* Guidelines**

Plaintiff's fourth cause of action seeks a judgment declaring that *The Tattler* Guidelines are unconstitutional as overbroad, vague, ambiguous and repugnant in violation of the First Amendment.  Plaintiffs' fifth cause of action seeks injunctive relief enjoining the defendants' from adopting and implementing the Guidelines.  Defendants moved for summary judgment and dismissal of all claims against defendants in their individual and official capacities.  However,

50

defendants presented only a cursory argument in support of the Guidelines.  Defendants briefly argued that the Guidelines do not result in a restraint on student speech, but rather, the Guidelines are related to the ICSD's pedagogical concerns and assist the Faculty Advisor in keeping obscene material out of the newspaper.

The Supreme Court has held that prior restraints are subject to the highest degree of scrutiny and are the form of regulation most difficult to sustain under the First Amendment. *Near*, 283 U.S. at 713.  Generally, there is a "heavy presumption" against the validity of a prior restraint.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The Second Circuit, however, has "declined to hold that a system of prior restraint is presumptively unconstitutional" in schools because of the "unique requirements of the educational process".  *Thomas v. Board of Educ.*, 607 F.2d 1043, 1049-50 (2d Cir. 1979) (citing *Eisner*, 440 F.2d at 805).  It is well-settled that the ICSD may restrict the time, place, and manner of protected speech.  *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir.1996) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  To withstand constitutional scrutiny, however, such restrictions "must be (1) content neutral, in that they target some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit alternative channels for expression."  *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006) (citing Ward, 491 U.S. at 791).    In the case at hand, defendants' have offered no evidence demonstrating that the Guidelines withstand constitutional scrutiny.  The Court recognizes that plaintiffs have failed to specify how, why or which portions of the Guidelines are vague or overbroad.  However, defendants have moved for summary judgment, and thus, bear the burden of proof.  Defendants have failed to cite to any case law or provide any evidence that the Guidelines are narrowly tailored to serve defendants'

interests and pedagogical concerns.  Consequently, with regard to this issue, the Court is unable to conclude that defendants' have met their burden and demonstrated that no genuine issues of material fact exist.   Accordingly, defendants' motion for summary judgment is denied as to plaintiffs' fourth and fifth causes of action.

**VIII.  Qualified Immunity**

The Court has determined that defendants' are entitled to partial summary judgment and dismissal of plaintiffs' first, second and third causes of action.  Qualified immunity shields the defendants only from claims for monetary damages and does not bar actions for declaratory or injunctive relief.  *Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir. 1999) (citing *Wood v. Strickland*, 420 U.S. 308, 315 n. 6 (1975)) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."), *overruled in part on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Plaintiffs remaining causes of action seek declaratory and injunctive relief.   Therefore, defendants' arguments with regard to qualified immunity are moot.

**CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 32) is **GRANTED** with regard to plaintiffs' first, second and third causes of action; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 32) is **DENIED** with regard to plaintiffs' fourth and fifth causes of action; and it is further

**ORDERED** that defendants' motion for qualified immunity is **DENIED**.

**IT IS SO ORDERED.**

Date:   March 23, 2009

_____
Norman A. Mordue
Chief United States District Court Judge